Good morning. It pleases the Court, this is Jason Bach on behalf of the Plaintiff Appellants Nicholas Oliva and Joan Oliva. I would like to reserve five minutes before rebuttal. This is an appeal of both a 12B6 motion to dismiss and a motion for summary judgment prior to trial. Addressing first the issue of the motion to dismiss, the most substantial claim in our complaint that was dismissed as part of that motion was the Truth in Lending Act allegation. That claim was dismissed by the District Court based upon an argument that the three-year statute of limitations had expired. However, in the same order, the District Court allowed to stand two state claims which also had a three-year statute of limitation because the Court felt that there was at least a question of fact as to whether or not there was equitable tolling of those statute of limitations. The same equitable tolling issues that apply to those state claims also apply to the Truth in Lending Act claims as well. The issues involved with the equitable tolling consists of the representations or misrepresentations that were made by the Respondents during the time that the mortgage process was taking place. Their assurances that they were going to change items within the loan documents, their refusal or lack of providing disclosures that are required, their failure to provide anything stating what at what point the payments were going to change, providing an amortization schedule that said after three years, your mortgage is going to become variable based on what the interest rate is. Let me just, I want to clarify something. You mentioned TILA. This was a residential mortgage, correct? It was, correct. And how is it that TILA applies to residential mortgages? I didn't think it applied to this type of mortgage. Well, the case law that gives us our basis for it that we have cited to in the brief has held, and cases from the circuit have held, that when there is a mortgage of this type, that a mortgage company is required to provide certain disclosures such as truth in lending, or I'm sorry, good faith estimates as to what the payments are going to be and what the interest rates could possibly be, showing at what point those interest rates could possibly change, disclosures explaining what the loan type is that they are receiving. Those are the things that the Truth in Lending Act, we believe, applies to a residential mortgage. But what relief is available to you? I mean, I think we're on a tangent that's irrelevant because the only relief that is meaningful would be rescission. It isn't the case that rescission is not available to you under the Truth in Lending Act for this kind of mortgage. Well, with this type of — Yes or no? Is rescission available to us? Yes. We believe yes. Why? Because what the statute says is that if that information is not provided to you, if the information is provided to you, you have a certain number of days, I believe, three days in order to rescind the agreement. However, if that information is not provided to you, like it wasn't in this situation, and, in fact, the Respondents have never said that it was, when that information is not provided to you, you have up to three years in order to rescind. No, but the condition of rescission is to tender back the loan, right? Yes. Which you haven't done. Well, that's exactly what we've been seeking to do in this claim. That was the point of bringing this agreement. And more than three years have passed between the closing and the filing of the complaint. Between that and the filing of the complaint. However, what we're holding out as the rescission letter, when the plaintiffs were still unrepresented, before the three years had expired, when they received notice that their interest rate was about to go up, they started investigating, realized that the loan documents were still not accurate. They did not receive notice that their interest rate was about to go up, did they? After the three years went up. Their interest rate went down. Well, that's not necessarily true. At first, the interest rates went up. And at the time that the complaint was being filed, you know, the interest rates went up 1.25%. However, then, of course, the mortgage rates went down, and the variable interest rate went down. The point is, this is a 30-year mortgage. The interest rates are going to go up and down throughout the course of this mortgage. That's not where the... Now, but your client's arguing that it wanted a seven-year fix. And we pretty well know now that over the seven-year period that your clients wanted fixed, circumstances worked out to their benefit. Circumstances would have worked out to their benefit. There is no actual damages claim, because it turned out there wasn't an injury suffered by your client. Is that correct? Well, that's the opinion that they... Well, not just an opinion. It's the finding of the district court, and I don't see anything that shakes that. Do you have anything that presents otherwise? Absolutely. That is one facet of what the damages are in this case. And what the Nevada Supreme Court has said, that if you commit a fraud and you happen to benefit from that fraud, I'm sorry, if the person who is the victim of the fraud happens to benefit from that, the other side, the person who committed the fraud, doesn't receive the benefit. It's not trying to receive the benefit. It's not trying to charge you the higher rate and get the money from you. So what do you have to tell us? Sure. What the damages are, or the interest that's being paid now, my clients would have never entered into this loan had this not occurred. Not true. Not true. Your clients take in the position they would have entered into a different loan. They weren't going to live on the streets. Let me rephrase that. They would never have entered into a three-year variable interest loan had they known that that was not going to change. That's fine. But what they say is they would have entered into a seven-year fix, and that would have cost them more money. So I'm having trouble figuring out what the actual damages are. Okay. What this Court has said is even when there is a minor technical violation of the Truth in Lending Act, when certain disclosures are not made, when the good faith estimates are not provided, that there has been a violation. Well, if there has been a violation, we have to look at what the damages were. The down payment. What the down payment was. What the down payment wasn't going to change in the slightest. The loan fees. You're trying to go back to rescission. And I'm telling you, that's a different argument. I see nothing to suggest that the District Court was incorrect in concluding that there were zero actual damages. I'm going to give you one more chance to see if there's something else you can offer. The rescission argument is something different. Well, you know, with the rescission argument. So we're under rescission now. We're going to give up on the actual damages. No. There are actual damages here. Don't wait until you hear what they are. Okay. Well, in our opinion, the actual damages are the cash out-of-pocket that my clients paid in order to secure a loan that they no longer had the comfort of knowing that they had a seven-year loan that they could rely on over the course of seven years. What cash out-of-pocket are we talking about? We're talking about $170,000 down payment. The rescission. Okay. Okay. So you've got nothing for actual damages short of the rescission theory. I mean, I have to take that as a given because you've had three shots at it. Okay. But there are damages and there are rescissions. If there is a rescission, then they would receive what I'm calling damages in return if there is a rescission. No. If there's a rescission, you get back – you restore yourself to original position. And restoring the – And so let's go to that now. What's the proximate causation that leads to your client being able to pretend it wouldn't have bought a house? Well, the whole reason he bought this house in this particular area and involved with these particular people was because of the relationship, the very close relationship that he had with the people involved. Their representations and what they led them to believe over and over again in that don't worry about it. We will take care of it. We're going to change this. But let's take that for the moment. Where would he have bought a house? Is he going to have bought a house someplace where the housing market hasn't collapsed? I don't think he would have bought a house. I think they would have stayed put. However, you know, whether or not they would have bought a house, you know, in a different area or not, we'll never know because they never had the benefit of a full disclosure of all information. And basically, the only reason that that didn't happen was because these were their friends that they trusted. And, you know, that is the key here. This isn't just an arm's-length transaction where it's a mortgage broker and someone is trying to buy a house. Were these the only people selling houses in the Las Vegas area at the time? Of course not, but these were the people they trusted. So why is it we should expect that your client's not going to acquire a place to live except through these people they had working relationships with? Because when these people were, you know, going on their trips together, socializing with each other on, you know, weekly basis, the conversation of where to buy houses, where you might want to look, we can handle the mortgage, we can get you this, we can do that is what their conversations were about. Besides Nicholas Oliva, the other two individuals involved were both in the real estate, either the real estate market or the mortgage market. And so that's what the conversations revolved around. That's where they developed the trust, and that's why they believed that they were going to be honest with them and actually do what it is that they said that they were going to do. I'm down to about four minutes. I'm going to reserve the rest for everybody. Okay. We'll hear for the attorney from National City Mortgage. Thank you. Good morning, and may it please the Court. This is a cross-appeal. There are two issues here. There's the appeal of the disposal of the Oliva's claims on the merits, as well as National City's cross-appeal on two procedural issues. On appeal, this Court should affirm the disposal of the Oliva's claims because they can present no cause of action as a matter of law.  The Court should reverse the sanction against National City and reverse the District Court's denial of National City's motion for attorney's fees. At its essence, the Court is right. This case involves a mortgage loan that provided objectively more favorable terms to the Oliva's than the one they alleged they were promised. In retrospect, at the time it couldn't have been said objectively more favorable because nobody knew where interest rates were going to go. That's right. That was now seven years ago. So under the loan that the Oliva's alleged they had, the interest rate would have changed just a few months ago for the first time and been higher than where they are now. It really raises the question, who sues when their interest rate goes down? The Court is right. In May of 2008, the Oliva's would have received the first rate change letter that said their interest rate was dropping from 5.625 to 5.5. The record reflects that, and Mr. Oliva admitted that in his deposition. Weren't we just told that the first notice they received actually went up? You were told that. That's not a factual statement that contradicts the record. I'm not going to go into the details of the Oliva's claim.  the claim that the Oliva's claim failed, that really raises their claim fails. Besides the damages, there's absolutely no liability. And I think this Court was right on when it addressed the rescission issue, the core of the Oliva's claim. You say no liability. I wanted to be clear. I understand what you say. I mean, you're saying there's no liability because there's no damages, or are you treating liability? I mean, usually we speak of liability and damages as, like, separate elements of a trial. Correct. Do you mean there's no liability separate and apart from the proposition there are no actual damages? That's correct. Why is that? Why is that? Looking at the causes of action alleged, they're simply not applicable. And I'll suppose the interest rates had gone up and there were actual damages. Wouldn't there be a legitimate claim for fraud? If, had the interest rates gone up, the fraud claim still would have failed because it was past the statute of limitations and there's no justifiable reliance. Remember, Nicholas Oliva is a day trader by profession. Joan Oliva is a licensed real estate agent. The district court found there was no justifiable reliance because those, the Oliva's know that a lender cannot simply change the terms of the loan after the borrower signs the closing documents and then leaves. It's simply unheard of that, oh, don't worry, we'll change the terms after you've signed it. That reliance is not justifiable. The Nevada Supreme Court said in terms of looking at red flags and danger signals, what's out there? And the Oliva's knew that. They told us in their complaint that they offered to cross out and change the three-year arm on hundreds of pages to have that reflect a seven-year arm, that they would cross that out, sign, and initial those changes. So they knew the procedures. And so the statement that, oh, don't cross it out, I'll change it, is simply too absurd to really be justified. Maybe, although I've got to tell you, if there were actual damages here, I'm not sure that their claim could be shunted away quite so easily. I mean, people get told to trust me a lot. And it's okay to say actors we shouldn't trust me. But if, in fact, they could make out a claim, look, these people they've worked with for years and knew said we're going to fix the paperwork, but we want to get this locked in, blah, blah, blah, blah, blah, and someone does it, and then it turned out they were lied to, there's still a pretty good claim for fraud in there. There may be. But keep in mind, Nevada has a three-year statute of limitations for fraud. And two years ---- Presumably runs from when they knew or should have known. And if they don't know until they get a notice after three years that, by the way, your rate's gone from 5 percent to 14 percent because we're back to the late 1970s, they'd have a pretty good basis for coming in to say, hey, wait a minute, we've been had. That's right. But the Nevada Supreme Court said where uncontroverted evidence proves that the claim, the record reflects that on May 31st, 2005, just a week after they signed, they received in the mail from the title company their final copies of the documents, including the recorded deed of trust. And all those documents said three-year arm. Well, you're a lawyer, so the answer to the question might be yes, but when you bought a home and received a thick stack from the title company, did you sit and read all of it? I didn't. That's right. But the Nevada Supreme Court says knew or should have known. Mr. Oliva was told, allegedly, we'll change the terms of the loan. If he gets those documents in the mail, he should read them. We know he opened the envelope because it contained a check. He admitted opening it up, and at his deposition he said they deposited the check. And we know that check was deposited on June 6, 2005, more than three years before. In any case, the operative fact that triggers the statute is his knowledge or imputed knowledge that the mortgage wasn't changed, right, from three years to seven years. So that triggers the statute of limitations. That's right. The Olivas are trying to get equitable tolling. Equitable tolling is available where a defendant makes some act to hide it. And here there was no hiding of it because National City recorded the deed of trust, providing notice to the Olivas, to subsequent purchasers, and the world that they had a three-year arm. The information was there. There's no reason why the Olivas, who were concerned about that, could not have obtained that information, especially when it was mailed to them. But if they can't rescind the loan, and certainly they can't, the Truth in Lending Act does not provide for rescission of purchase money mortgages. And I think the Court addressed that while counsel was up. The statute specifically excludes that. That leaves rescission under the common law of contracts, which they're not entitled to, one, because they waived their right to rescind by suing for breach of the contract. Moreover, what this Court recognizes is the tender. We never saw a tender. In fact, the Olivas' purported rescission letter never seeks rescission. Nicholas Oliva makes it clear. All I want is what I was promised. It doesn't tender the loan proceeds back. They do not. In fact, the record indicates they don't have the financial ability to do that. But that's a requirement of common law rescission. That's correct. It would also be a requirement under Truth in Lending Act had rescission been available to them under that statute. So it really begs the question, who sues when their interest rate goes down? At best, they'd be entitled to the benefit of the bargain damages, which, as this Court recognized, would only be available had their interest rate increased. We have the benefit of hindsight, which really goes into the issue now of the cross appeal, is this case fails for so many reasons. Why didn't the district court award attorneys' fees? It's a per se abuse of discretion to not apply the proper standard. Well, the attorneys' fees, you thought, were sanction-type fees, right? There was a discovery sanction, which is a separate part of the cross appeal. No, I mean sanction for filing a frivolous case. That's correct, under Nevada statute. I have two questions on that. First of all, why is this case governed by Nevada statute instead of by Federal Rule 11? Well, there's numerous ways to get attorneys' fees. Rule 11's ---- My question is, why should a State statute that provides for sanctions for, you know, attorney conduct, govern in Federal court? Well, there's a United States ---- Well, the United States Supreme Court addressed that in Alieska Pipeline Services for 21 United States 240 and said where there's a State law that does not conflict with Federal law. No, no, no. That's not the sanction-type award, though. That's just, you know, attorneys' fees for work done, right? It's not, you know, to regulate attorney conduct, which is what the Nevada statute you're talking about. That's correct. And it promotes the public policy of the State of Nevada, which is to hold attorneys responsible for frivolous cases. Oh, that's exactly what I'm getting at. In other words, conduct in the Federal court should be governed by a Federal law, not by State law, should it? No, the United States Supreme Court said that a State law given a right to attorney's fees should be followed. Well, that's attorneys' fees on the merits. In other words, you know, for work done, where you award attorneys' fees to a prevailing party, for instance, on a contract action, whatever it is. But I'm talking about, you know, where you're, in effect, punishing an attorney for what he does in court, right here in the Federal court. In other words, you think, you know, if you or your opponent does something that attorneys shouldn't do in this courtroom, that we should look to California law to see if he should be sanctioned, or we should apply Federal law? You can apply either under that Supreme Court decision. All right. Why was this case frivolous? The case was frivolous because on the merits, it failed for numerous reasons. Well, but he didn't know that when he filed the complaint, did he? Well. In other words, no one could predict at that time which way, you know, interest rates would go. Well, it's frivolous beyond just the lack of damages. The majority of the claim involved the Truth in Lending Act, which, had counsel read, would have indicated it didn't apply to purchase money mortgages. We're also looking at causes of action that were alleged in the complaint, the first amended complaint, that simply have no bearing. Conversion, quiet title, the negligence claim, contract regarding an oral agreement. I don't know that I've seen attorneys' fees award for frivolous litigation because there were additional accounts pledged that had zero traction. The core of the complaint, I don't know that it could fairly be described as frivolous. As it turned out, there were zero damages, so it may not have been meritorious. But at the time the complaint was filed, you weren't through the seven years, and if interest rates had suddenly gone up, there could have been actual damages. Now, I've heard your other arguments with regard to why the claim lacked merit, but those are at least contestable or colorable arguments. They may be right, but I'm not sure that it could be said to oppose your position would have been frivolous. And so I really come back to the question, is there anything other than the lack of actual damages that would support the characterization of this claim as being frivolous? Well, even though the truth in lending claim was dismissed early in the litigation, that remained the focus of the alibis prosecuting this case. That portion of it, and we saw a lot of that in discovery and in the expert's issue. And keep in mind, it's not just filing a lawsuit that makes it frivolous. It's maintaining once it's cleared, it became frivolous. And sure, the interest rate dropped a little bit. Maybe it could have gone up, and in fact, it went up slightly on the second rate change. But once it declined and continued to decline, at some point it became clear. So the attorney fees No. It became mathematically impossible, I think, after year five. That was the last fix that would have covered the seven years. Did the district court, Judge Pro, explain why he denied your fees? No. That's why we find it's an abuse of discretion. The court set forth no grounds why it denied the attorney's fees and did not set forth what standard it applied. I think it's fair to say that if the district court were to apply it on remand, this court should instruct the district court to apply the appropriate liberal standard. The Nevada statute states specifically it mirrors Rule 11. How about the discovery sanction? The discovery sanction should be reversed because the findings on which the district court based the sanction were clearly erroneous. We talk about the Olivas claims not having merit. They raised a lot of smoke and mirrors to try to hide that. Well, first of all, specify what that finding was that you said. The factual finding was there's three of them. One is that National City did not disclose to the Olivas that it did not publish its interest rates. National City in its Rule 34 responses stated that its interest rates were internal and they were proprietary. The Olivas knew that. In their motion to compel, they raised with the district court, they stated we have no other way to get this information. That necessarily means that they're published and the Olivas know they're published. Because the National City's Rule 34 responses were attached to the motion to compel as well as the Olivas' response to the motion for summary judgment, the district court also knew that National City didn't publish its interest rates. So the court's finding that National City withheld that was clearly erroneous. Well, there were a lot of discussions about these interest rate sheets, were there not? And they were all. Yes. Yes. Okay. And, in fact, you know, one of the big arguments by the defendants early on was that all the claims were time-barred, correct? That's correct. And so these interest sheets became very important at the motion to dismiss and the Olivas should apply. And the plaintiffs really asserted strongly to the district court, at least from reviewing the record, that to defend, they needed the rate sheets. And so they filed this motion to compel. There were hearings on the motion to compel. After hearing all of this, and there was discussions of whether this was published interest rates. You heard the defendant, I mean the plaintiffs, describe what this was. You never clarified throughout that whole process the difference, it seems, between the published interest rates sheet and then the private proprietary internal interest rates. And it seems at the very end the district court had to review what happened. And it's just hard to believe that you didn't know the defendant, what they were talking about, the document that they were talking about, wasn't the same interest sheets that the defendants were requesting. I'm trying to figure that out. I don't think that's right. Because the Olivas, even in their motion to compel, stated we are more than willing to sign a protective order. Yeah. Once the district judge said in the 56F relief, which required the Olivas to produce documents of damages, which they never had, and for National City to produce its published rates, we didn't have published rates, so we offered to the Olivas the privileged rates subject to that protective order, which suddenly the Olivas then decided they weren't going to sign, even though in their moving papers they stated they would. So I think the court's finding that what National City was doing was egregious was clearly erroneous. Well, I mean, they volunteered to sign a protective order. You didn't take that deal. The court issued its order. It didn't require a protective order. You decided to add a condition. Okay, now I want the protective order. They said no. You could argue to the district court they tried to add a condition. He didn't buy it. He said enough already. You're wasting my time, everybody's time. You're going to have to pay for that time. Well, again, it goes to the definition of published. We interpreted that as being published to the public. Was it really that hard to figure out what they were asking for? The fact that whether or not you made it available to the world didn't mean you couldn't figure out what they were asking for. Well, it was unclear because Mr. Oliva's discovery was all gauged on what was published. They could have issued discovery and requested all rates or not limited their request. So I stand on that. I see I'm out of time unless the Court has any other questions. Thank you. Thank you. First off, I want to restate something that I misspoke. The interest rates went up on the second notice, not the first notice. And they went up to a level that was actually lower than the original level. So, in fact, they never were out at all. They were always ahead of the game, the way the interest rates played out. You know, I don't necessarily believe that that's the case. I believe the second time when it went up that it was above. But, again. It wasn't. Okay. There's another issue besides the truth in lending, and that's really what this case was spent in discovery and litigating on, and that was the fraud. And what our experts have provided an expert report on was that based on the interest rates that the Olivas were provided, as opposed to what they should have been more in interest than what they should have had they been provided what they were supposed to have received. So, getting to the issue of damages, which may be more relevant to the issue of fraud, that is where, you know, the expert came in and said that in reviewing what they should have been provided as opposed to what they received, that that was at least a portion of damages. Of course, we also contend, you know, all of the other damages as well. Getting to the issue of the sanctions that were awarded, the $10,000 sanctions against National City, what transpired during that time was, as the court pointed out, numerous hearings where we were asking for the interest rate information, because if we could compare what the 3-year interest rate was. Scalia, but you always asked for published rates, didn't you? We always asked for the published rates, and then their initial objection was that it was internal and proprietary. At that point, we, when we brought the motion to compel, we said we don't care if it's internal and proprietary is irrelevant. We want the rates of what the 3-year rate was compared to what the 7-year rate was. And after all of these hearings, it wasn't until three days or two days before the deadline that they had to turn this stuff over that we were contacted and said, okay, we just want you to sign a confidentiality agreement or a protective order, and we'll turn it over to you. No, that wasn't – after all of these hearings, that's not what Judge Proe said. That's not what he told us to do. And so when they then again refused to provide that, in addition to turning over that – You declined to sign the protective order, right? We did decline to sign a protective order. In addition to that, when we – Isn't that, though, the protective order, in essence, that in the end Judge Proe ordered? No, Judge Proe never ordered – he never ordered a protective order. He ordered a protective order, didn't he, when he ordered production? No, because what happened is they said, we have nothing to give you. We can't give you anything. No, no, no. In the end, in the end. Remember? And that's the reason he held them in contempt, because they didn't produce it. Right? But when he ordered it, he – didn't he add a protective order to it? No. In the end, what happened at the time that the sanctions were issued, National City said, you know, we – you know, we have – we simply have nothing that meets this request that we can provide you. And at that point is when Judge Proe said, you should have been telling this all along. We shouldn't have to go through 10 months of discovery requests, motions, and hearings to get to this point where you fail to inform us that you don't have what it is that they're asking for. In addition to that, there were other discovery issues involved in this case. There were depositions where the defendants themselves refused to answer questions that were reasonable and which were asked. There were other internal notes that they admitted to having at the time of when this loan was processed and said that they keep all these notes and information forever, but for some reason when we asked for them to be produced, they claimed to not to have them. And we believe that that also prejudiced us in this case. Thank you. Thank you, both counsel, for your helpful arguments. The case just argued is submitted.
judges: Tashima, Clifton, Murguia